UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ALEX SILVAGNOLI,

                                        Plaintiff,

        v.                                                          9:07-CV-561
                                                                    (NAM/GJD)
BRIAN FISCHER, *et al.*,

                                        Defendants.

_____

ALEX SILVAGNOLI, Plaintiff *pro se*
JUSTIN LEVIN, Ass't Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

        In this amended civil rights complaint, plaintiff makes a variety of claims,

including failure to investigate, deliberate indifference to his serious medical needs,

failure to protect him from being assaulted by other inmates, retaliation for

complaining about his medical needs, and sexual harassment. Amended Complaint

(Dkt. No. 7)(AC).  Plaintiff also appears to allege a violation of the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (AC at 5, 5-a).[1]  Plaintiff seeks

_____

        [1] The amended complaint is written on a form-"Inmate Civil Rights Complaint under 42
U.S.C. § 1983."  The pages on the form-complaint are numbered, but plaintiff has inserted
unnumbered pages in between the numbered ones.  For clarity, the court will cite to the form's
numbered pages and will refer to the unnumbered pages with the form-page followed by letters
beginning with "-a."  The court will refer to the pages of the plaintiff's attached exhibits simply
by "Exs." followed by a page number.

substantial monetary relief.  (AC at 6).

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 38).  Plaintiff has not responded to the motion.[2]  For the following reasons, this court finds no genuine issue of material fact regarding (1) plaintiff's claim that defendants Fischer and Wright failed to properly investigate plaintiff's letters of complaint, and their lack of personal involvement in his medical care; (2) plaintiff's separate medical care claim; (3) his claim against defendants Fischer and Pearlman for failure to protect and (4) his claim against defendant Neafach for sexual harassment and retaliation.  Finally, plaintiff states no claim under the ADA.  Therefore, the court will recommend granting defendants' motion for summary judgment and dismissing the amended complaint in its entirety.

## DISCUSSION

### I.    Facts and Contentions

In this amended complaint,[3] plaintiff names four defendants: Brian Fischer, the

---

[2] In their motion for summary judgment, defendants have included the "notice" to a pro se litigant of the possible consequences of his failure to respond to the motion. *See* Dkt. No. 38-5.

[3] Plaintiff's original complaint asserted claims regarding his medical care beginning in 1994 and continuing until "present time of 2007." Compl. ¶ 6 (Dkt. No. 1).  On June 11, 2007, Chief Judge Mordue ordered plaintiff to file an amended complaint, removing references to incidents occurring "no more than three years prior to the date on which this action was commenced." (Dkt. No. 6 at 3).  Plaintiff filed his amended complaint on June 25, 2007. (Dkt. No. 7).  When plaintiff filed his amended complaint, he eliminated a great deal of information, and it now appears that he is complaining about incidents beginning in October of 2006 and continuing through 2007. (Dkt. No. 7).  However, in eliminating material from the complaint, he also seems to have eliminated some documents that are relevant to his more recent claims.  Chief Judge Mordue warned plaintiff in the June 11, 2007 order, that the amended complaint must "supercede and replace in its entirety the previous complaint filed by plaintiff . . . ." (Dkt. No. 6 at 5).  This court has examined some of the documents attached to the original complaint for clarity only.

Commissioner of the Department of Correctional Services (DOCS); Dr. Lester Wright, DOCS Deputy Commissioner and Chief Medical Officer; Kenneth Pearlman, former[4] Superintendent of Mid-State Correctional Facility (Mid-State); and Susan Neafach, a correctional counselor at Mid-State.

Plaintiff has organized his amended complaint with sections, containing facts that he believes relate to each defendant.[5]  With respect to supervisory defendants Fischer, Wright, and Pearlman, the sections of plaintiff's amended complaint explain the facts that plaintiff believed required proper investigation by the defendants. (AC at 4-5-d).  With respect to defendant Neafach, the amended complaint explains the conduct that plaintiff attributes to her.  Plaintiff states that he has been denied constitutionally adequate medical care, he has been assaulted by another inmate on two occasions, and he has been sexually harassed and treated improperly by defendant Neafach.  Plaintiff central claim appears to be that the supervisory officials, Fischer, Wright, and Pearlman have failed to properly investigate his complaints and have failed to supervise their subordinates, who allegedly engaged in the unconstitutional conduct.

The amended complaint contains three causes of action.  The first states that defendants Fischer and Wright failed to properly respond to plaintiff's letters of

---

[4] Defendant Pearlman was the Superintendent of Mid-State at the time of the incidents forming the basis for plaintiff's complaint. (Pearlman Decl. ¶ 4, Dkt. No. 38-8).  He is currently DOCS Deputy Commissioner of Program Services and has held that position since November 22, 2007. (*Id.* ¶ 3).

[5] Each factual recitation begins with a statement as to which defendant the facts apply. (*See* AC at 4, ¶ 6)("Defendant number (1) Commissioner Brian Fischer . . . .")

complaint about his "medical needs." (AC at 5).  The second cause of action states that defendant Pearlman did not properly investigate plaintiff's complaints regarding his safety, nor did defendant Pearlman take appropriate disciplinary action against his staff. *Id.*  Finally, plaintiff claims that the "defendants in this action" failed to comply with "policies, Directives, and procedures" in providing plaintiff the proper medical care.[6]  The plaintiff does not include a separate "Cause of Action" against defendant Neafach for sexual harassment, but based upon the factual statements in the amended complaint, it is clear that plaintiff is attempting to make such a claim against her, and defendants have responded to plaintiff's allegations. (*See* AC at 5-e-5-g).

Plaintiff was deposed on June 18, 2008, and the transcript of the deposition has been attached as Exhibit B to the affidavit of Justin Levin.[7] (Dkt. No. 38-4).  In addition to plaintiff's deposition, defendants have filed medical records and disciplinary records relating to the plaintiff's complaints.  In support of their motion for summary judgment, defendants have each submitted a declaration, together with supporting exhibits.  Because the amended complaint is unclear,[8] the court has attempted to clarify the bases for plaintiff's allegations by incorporating the facts contained in the documents submitted by defendants.

---

[6] Plaintiff makes a passing reference in this cause of action the "rights of a disable [sic] person," that this court has associated with plaintiff's attempt at an ADA claim.

[7] The court will cite to the deposition transcript as (T)..

[8] The court must also point out that the amended complaint contains some documents as exhibits that were created after plaintiff filed his original complaint. *See e.g.* (AC Exs. at 12-14) (Letter addressed to both Brian Fischer and Lester Wright).

## A.    Failure to Investigate Medical Care[9]

Plaintiff has been in a number of correctional facilities and has had various medical conditions that he states required, and still require, attention.  In the amended complaint, he discusses the conditions he has, and the alleged conduct by corrections personnel that led plaintiff to writing letters to defendants Fischer and Wright. Plaintiff first states that he had a torn anterior cruciate ligament (ACL) for many years, requiring knee surgery.  Plaintiff outlines the alleged lengths to which he has gone to obtain this surgery. (AC at 5-a-5-c).  He states that at one point, he was the subject of a "medical hold," and that someone "uplifted" this hold in order to transfer plaintiff to another facility, causing plaintiff to lose his opportunity for an MRI and "possible surgery." (AC at 5-a).  Plaintiff claims that defendant Wright is the one who authorizes medical trips or operations and was, thus, aware that the plaintiff was in need of surgery. *Id.*

In February and March 2007, while plaintiff was confined at Midstate Correctional Facility, plaintiff alleges that, on one occasion, defendant Neafach[10] did not take the proper action when plaintiff was having an episode of "serious high blood pressure." (AC at 5-g).  He complains that instead of sending plaintiff to the infirmary, defendant Neafach sent plaintiff to the mental health unit, thus, interfering with his ability to obtain medical care.

---

[9] The claims about plaintiff's medical care appear in the section entitled "Defendant # 2," referring to Dr. Wright. (AC at 5-a-5-c).

[10] Plaintiff makes other claims against defendant Neafach that are discussed in Section II(D) below.

In late April, 2007, plaintiff was at Auburn Correctional Facility (Auburn). Plaintiff alleges that on April 19, 2007, he had an "incident" due to the weakness in his left knee, but he was simply told to submit a "sick call" request by the First Aid Department. (AC at 5-b). At some point, plaintiff also injured his right ankle. *Id.* Plaintiff then complains about the unprofessional conduct of a nurse at Auburn and discusses a grievance that he filed against her[11] that plaintiff claims was not properly investigated. (AC at 5-b; AC Ex. at 5).

Plaintiff states that he was examined by Dr. Dolan[12] on May 14, 2007. Dr. Dolan ordered x-rays of plaintiff's ankle, but when plaintiff was told that the x-rays were normal, he asked for a "second opinion." (AC at 5-b). Plaintiff states that, although he was put on "bed rest" on May 29, 2007 due to his ankle injury, he was denied his request for a cane. Plaintiff also claims that he was told to stop putting in sick call requests. A second x-ray, taken on June 12, 2007, confirmed that there was "no evidence for any fracture, dislocation, nor any joint effusions." (Levin Decl. Ex. C at 1-2).

Plaintiff claims that as a result of the denial of proper medical care at various facilities, he wrote to defendants Dr. Wright and Commissioner Fischer to complain about his allegedly unconstitutional treatment. Plaintiff has attached three letters as part of the exhibits to his amended complaint. (AC Exs. at 9-14). Only two of the

---

[11] This nurse is not a defendant in this action. However, plaintiff has attached some of the grievance documents to the amended complaint. (AC Ex. at 5-6).

[12] Dr. Dolan is not a defendant in this action.

letters are addressed to defendants Fischer and Wright. (AC Exs. at 10-14). The first letter to these defendants was written less than one month before plaintiff's original complaint in this action was filed, and the second letter was written after the original complaint was filed. Some of plaintiff's other letters are attached to Dr. Wright's declaration. (Wright Decl. Ex. A, Dkt. No. 38-6 at 15-17)[13] One of these letters was sent after the amended complaint was filed. (Wright Decl. Ex. A at 7-8). The amended complaint also makes a passing reference to the lack of a "reasonable accommodation" under the ADA. (AC at 5-a).

Plaintiff had an MRI on his left knee on June 4, 2007[14] which confirmed a tear of the left ACL. (Levin Decl. Ex. D). On July 27, 2007, plaintiff was examined by Dr. Mitchell Rubinovich, an orthopedic specialist, who reviewed the MRI report, found that plaintiff had a torn ACL in his left knee, and that he had "not improved with conservative treatment." *Id.* Dr. Rubinovich stated that ACL reconstruction was "indicated," and ACL surgery was performed on the plaintiff on October 1, 2007. (*Id.* Ex. F, Operative Report). By January 18, 2008, Dr. Rubinovich reported that plaintiff was doing "***exceptionally well***." (*Id.* Ex. G at 2)(emphasis added).

## B.    Failure to Protect

In the section of the amended complaint devoted to his claims against defendant

---

[13] The pages of Dr. Wright's Exhibit A have not been separately marked. The court will refer to the page numbers contained in the CM/ECF header, which are simply the pages of the document as it was scanned into the CM/ECF system, counting from the first page of the declaration forward. The entire document contains 21 pages.

[14] The MRI was done after the original complaint was filed, but prior to plaintiff's amended complaint in this action.

Pearlman, plaintiff alleges that, due to a lack of security and supervision, he was assaulted by an unknown Mid-State inmate on February 23, 2007 and again on March 12, 2007. (AC at 5-d).[15]   Plaintiff seems to imply that he was assaulted due to a "confrontation" between plaintiff and a member of the correctional staff. *Id.* However, plaintiff also claims that defendant Corrections Counselor, Susan Neafach may somehow have been involved in the assaults on plaintiff because he rejected her sexual advances.  In an attempt to show that defendant Pearlman failed to properly supervise his staff, plaintiff claims that, in January of 2007, one of the officers at Mid-State was arrested in connection with a drug-related incident. *Id.*

### C.    Sexual Harassment/Retaliation

Plaintiff alleges that defendant Neafach was the corrections counselor in charge of teaching the chemical dependency/sex offender treatment program (CD/SOTP) in which plaintiff was enrolled while he was incarcerated at Mid-State. (AC at 5-e). Plaintiff claims that, on February 13, 2007, defendant Neafach made inappropriate sexual advances toward plaintiff.  Plaintiff claims that he rejected defendant Neafach's sexual advances, and as a result, defendant Neafach began to retaliate against plaintiff in various ways.  Plaintiff claims that he was removed from the CD/SOTP program for unsatisfactory performance.

Plaintiff also claims that he tried to tell defendant Neafach that he was in danger, but that she laughed at him and threw his complaints in the garbage. (*Id.* at 5-

---

[15] It is unclear when exactly plaintiff is alleging that he was assaulted.  On one page of the amended complaint, plaintiff states that he was assaulted on "Feb. 23 & 27." (AC at 4). However, on another page, he states he was assaulted on "Feb 23 and March 12." (AC at 5-d).

f).  Plaintiff implies that this conduct occurred prior to the February and March assaults.  *Id.*  Plaintiff alleges that defendant Fischer failed to properly investigate letters complaining about defendant Neafach.

## II.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990)(citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact.  *Salahuddin*

*v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006)(citing *Celotex Corp.*, 477 U.S. at 23).
The second method requires identifying evidentiary insufficiency, not merely denying
the opponent's pleadings. *Id.*

In their motion for summary judgment, defendants argue that defendants
Fischer, Wright, and Perlman were not personally involved in any of plaintiff's alleged

If the moving party satisfies its burden, the nonmoving party must move
forward with specific facts showing that there is a genuine issue for trial. *Id.* A
dispute about a genuine issue of material fact exists if the evidence is such that "a
reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*,
477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a
court must resolve all ambiguities, and draw all inferences, against the movant. *See*
*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Additionally, while a court
"'is not required to consider what the parties fail to point out,'" the court may in its
discretion opt to conduct "an assiduous view of the record" even where a party fails to
respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*,
258 F.3d 62, 73 (2d Cir. 2001)(citations omitted).

In their motion for summary judgment, defendants argue that defendants
Fischer, Wright, and Perlman were not personally involved in any of plaintiff's alleged
constitutional violations, and that his medical care, failure to protect, and sexual
harassment claims all fail on the merits.

## A.   Medical Care

In order to state an Eighth Amendment claim based on constitutionally
inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently
harmful to evidence deliberate indifference to serious medical needs." *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to

the inmate, the inquiry is narrower. *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Id.* (citing *Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she

knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted).  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff has not named any of the individuals who were actually

13

involved in his medical care.  Rather, he has focused on the Commissioner of DOCS and Dr. Wright, the DOCS Chief Medical Officer,[16] claiming that their failure to properly investigate his letters of complaint denied him proper medical care.  Plaintiff makes one allegation directly against defendant Neafach, claiming that she denied his access to proper medical care because she sent him to mental health department rather than the medical department when plaintiff was having "an episode of serious high blood pressure."  However, before the court turns to an analysis of plaintiff's medical care claim, it will discuss whether either of defendants Fischer and Wright were "personally involved" in the constitutional violations alleged by plaintiff.

### 1.  Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the

---

[16] Plaintiff does not allege defendant Pearlman's personal involvement in plaintiff's medical care.

14

wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007)(citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, plaintiff does not allege that defendants Fischer or Wright were involved in his day-to-day medical care. Thus, plaintiff may either show personal involvement because they failed to remedy the violation after learning of it through a report or appeal or were grossly negligent in managing subordinates who caused the violation.

### a. Letters of Complaint

During his deposition, plaintiff testified that he wrote five or six letters to defendant Fischer. (T. 15-17). Plaintiff also stated that he received one response from defendant Fischer, "but not according to what I was requesting for [sic]." (T. 15). There is no evidence that defendant Fischer, who is not a physician, had any personal involvement in plaintiff's medical care. As plaintiff conceded (T. 19), he did not speak to this defendant. Plaintiff's allegations against defendant Fischer are that he failed to properly investigate his letters, claiming unconstitutional medical treatment.

Plaintiff also admitted during his deposition, that he never met Dr. Wright, although he stated that he wrote Dr. Wright letters and had his family write letters. (T. 24-25). Plaintiff testified that Dr. Wright forwarded one of plaintiff's complaints to a

15

subordinate for investigation, but that "he never checked into the complaint." (T. 25). Basically, plaintiff has named these two individuals because they are "in charge." (T. 24).

It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007). Some courts have held, however, that if the supervisory official acts ***personally*** in denying a grievance at various stages of the grievance process, he may be sufficiently involved in failing to remedy the situation. *See Atkinson v. Selsky*, 03 Civ. 7759, 2004 U.S. Dist. LEXIS 20560, *2-4 (S.D.N.Y. Oct. 15, 2004)(denial of grievance sufficient for personal involvement). *See also Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986)(finding sufficient personal involvement).

This court finds that plaintiff's letters are insufficient to confer personal involvement by either defendant Fischer or defendant Wright. Defendant Fischer is the Commissioner of DOCS, who delegates the day-to-day operations of the various correctional facilities to his staff. (Fischer Decl, ¶¶ 3, 7). Because defendant Fischer has no medical training, he delegates decisions regarding inmates' medical care to the medical professionals on his staff. (*Id.* ¶ 8). Defendant Fischer declares that he has had no involvement with, nor does he have knowledge of any of plaintiff's

constitutional claims while he was incarcerated at any DOCS facility. (*Id.* ¶ 11-21). There is absolutely no indication from any of the letters that defendant Fischer had any personal involvement in plaintiff's medical care or in any of the complaints that plaintiff referred to vaguely in his letters, other than to forward the complaints to the appropriate officials for their review.

With respect to defendant Wright, a review of the plaintiff's letters shows that defendant Wright did not review plaintiff's records himself,[17] nor did he make any of the plaintiff's medical decisions. The fact that he or one of his staff responded to plaintiff's letter by ***reporting*** the result of an investigation that he referred to his subordinates for completion is not sufficient to confer personal responsibility. *Burns v. Trombly*, 624 F. Supp. 2d 185, 204-206 (N.D.N.Y. 2008)(Report-Recommendation)*, adopted by* 2008 U.S. Dist. LEXIS 37439 (N.D.N.Y. May 7, 2008)(citing *Shabazz v. Lee*, 03-CV-1520, 2007 U.S. Dist. LEXIS 1841, 2007 WL 119429 *7 n.4 (N.D.N.Y. Jan 10, 2007)(Homer, M.J).(a superintendent's adoption of a recommendation by an investigating officer cannot by itself demonstrate that he failed to remedy misconduct).

### b.  Failure to Investigate

Plaintiff claims that defendants Fischer and Wright failed to properly investigate his medical care complaints. The failure to investigate, as stated above, does not confer personal responsibility on the supervisory official. To the extent that plaintiff attempts to assert a separate constitutional claim of "failure to investigate," the law is

---

[17] At his deposition, plaintiff testified that defendant Wright had others respond for him and "never checked into the complaint." (T. 25).

clear, however, that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008)(citing *Nieves v. Gonzalez*, No. 05 Civ. 17, 2006 U.S. Dist. LEXIS 24302, *11-13 (W.D.N.Y. Mar. 2, 2006); *Longi v. County of Suffolk*, No. CV-02-5821, 2008 U.S. Dist. LEXIS 25468, *22-23 (E.D.N.Y. Mar. 27, 2008)).  In order for a constitutional violation to have occurred, the investigation itself must have resulted in a deprivation of a constitutional right. *Faison v. Hash*, 03-CV-6475P, 2004 U.S. Dist. LEXIS 29151, *6 (W.D.N.Y. Apr. 23, 2004)(citing *Malloy v. City of New York*, 1996 U.S. Dist. LEXIS 16417, *6 (S.D.N.Y. Nov. 7, 1996)(holding that warden's alleged failure to investigate assault by correctional officer did not give rise to constitutional violation, where plaintiff failed to show that warden could have anticipated or had other direct involvement in the assault); *Gomez v. Whitney*, 757 F.2d 1005 (9th Cir. 1985)(a claim against a police department for failure to investigate is insufficient to state a civil rights claim without another recognized constitutional right being involved)).

In any event, in this case, DOCS carried out several "investigations" of plaintiff's medical care complaints.  His letters were addressed, and prison officials responded to his concerns.  At his deposition, plaintiff testified that his concerns "were responded [sic] but not accordingly [sic] to what I was requesting for [sic]." (T. 15). Plaintiff received more than was constitutionally required.  In his declaration, defendant Wright states that between October 2006 and August 2007, plaintiff wrote "four rambling and conclusory complaints" to Wright's office alleging inadequate

medical care. (Wright Decl. ¶ 9, Dkt. No. 38-7).  Defendant Wright states that he

referred plaintiff's complaints to the appropriate staff for investigation, and that his

"staff" concluded that plaintiff had received appropriate medical care. (*Id.* ¶¶ 10-11).

Because each investigation revealed that plaintiff was receiving appropriate care,

defendant Wright's staff encouraged plaintiff to discuss his medical concerns "with his

primary care provider at his next appointment." (*Id.* ¶ 12).

Plaintiff had no constitutional right to any investigation, and he certainly had no

right to a particular outcome.  Thus, plaintiff's medical care claims against defendants

Fischer and Wright may be dismissed for lack of personal involvement, and to the

extent that plaintiff attempt to assert a separate claim of failure to investigate his

medical care complaints, that claim may be dismissed as well.

### 2.    Merits of Medical Care Claims

In this case, it appears that plaintiff's main complaint is that he did not receive

the care that he wanted when he wanted it.  At the same time that plaintiff was sending

letters to these supervising officers, he was receiving care from the facility staff for his

medical complaints, albeit, not in accordance with his particular desires.[18]

Defendants have included parts of plaintiff's medical records as exhibits to their

motion for summary judgment. (*See e.g.* Levin Decl., Exhibits C-G).  These exhibits

show that, although plaintiff alleged that he had a broken ankle that was not treated,

---

[18]   For example, plaintiff complained about a torn ACL in his knee by letter dated
October of 2006.  Defendant Wright assigned Richard Lester to investigate the complaint.  Lester
investigated the complaint and "closed" the file on November 8, 2006. (Wright Decl., Ex. A, Dkt.
No. 38-6 at 18).  Lester's comments were that plaintiff was "again scheduled to consult with an
orthopedist after refusing knee operation at Gt. Meadow." *Id.*

plaintiff had two sets of x-rays, each indicating that there was "no evidence for any fracture, dislocation, nor any joint effusions." (Levin Decl., Ex. C at 1-2).  The x-rays were taken on May 15, 2007 and on June 12, 2007 by Dr. Ali Gharagozloo, who is not a party to this action. *Id.*  Interestingly enough, one of plaintiff's letters, addressed to defendants Fischer and Wright is dated ***June 6, 2007*** and states that "I am walking on a fracture [sic] right ankle . . . ." (AC Exhibits at 12).  At that time, plaintiff had already had one set of x-rays indicating that there was ***no fracture***.  The second set were taken after the time of plaintiff's letter, again showing that there was no fracture.

Plaintiff had an MRI on his left knee performed by non-party, Dr. Mitchell A. Chess, on June 4, 2007. (Levin Decl. Ex. D).  On July 27, 2007, plaintiff was examined by Dr. Mitchell Rubinovich, an orthopedic specialist, who reviewed the MRI report, found that plaintiff had a torn ACL in his left knee, and that he had "not improved with conservative treatment." *Id.*  Dr. Rubinovich stated that ACL reconstruction was "indicated" for plaintiff, explained the risks and complications of surgery to plaintiff, and requested clearance from DOCS to perform the surgery at Rome Hospital. *Id.*

Plaintiff had his ACL surgery on October 1, 2007. (*Id.* Ex. F, Operative Report). On November 2, 2007, Dr. Rubinovich examined plaintiff and found that, four weeks after ACL reconstruction, plaintiff's knee was still significantly weakened, but had relatively good range of motion. (*Id.* Ex. G).  Dr. Rubinovich prescribed physical therapy at that time. *Id.*  On January 18, 2008, Dr. Rubinovich reported that plaintiff was doing "***exceptionally well***." (*Id.* Ex. G at 2)(emphasis added).  The doctor stated

that plaintiff could continue with "his own exercises for now," and that he should not do any sports until April. *Id.*

Plaintiff testified that he was given physical therapy in Attica in 1998, and that he was given exercises to do on his own, although he was not completely satisfied with the therapy. (T. 28-30).  Plaintiff claimed that after he was moved to Clinton, therapy was denied; however, after the surgery he was again afforded some physical therapy. (T. 30-34).

Plaintiff testified that he obtained his MRI only after he wrote to the superintendent "quite a few times." (T. 40).  At his deposition, plaintiff also complained about his treatment being delayed from March 2007 until July 2007. (T. 40).  Finally, plaintiff testified that the only reason that he obtained his requested surgery was that he filed this civil rights action against the defendants. (T. 34).

Basically, plaintiff disagrees with the type and timing of his medical treatment. He complains that he did not receive treatment, and then complains that he only received treatment after writing letters to the superintendent and other officials.[19] Because plaintiff did receive treatment, the "sufficiently serious" prong of the objective test for deliberate indifference considers whether the challenged delay was "sufficiently serious." *Salahuddin*, 467 F.3d at 280.

---

[19] The amended complaint also complains about someone lifting a "medical hold" placed on plaintiff by the mental health unit. (AC at 5-a).  Plaintiff claims this "automatically" violates the Eighth Amendment. *Id.*  Apparently, this "medical hold" is supposed to prevent plaintiff from being transferred to another facility. *Id.*  It is unclear what connection, if any, the mental health department would have to plaintiff's knee, back, or ankle issues.  In any event, plaintiff fails to allege how the "lifting" of a medical hold would have shown deliberate indifference by the named defendants.

When plaintiff was evaluated for and did have surgery on his knee, the doctor indicated that prior conservative treatment had not been successful and that surgery was indicated.  He did not indicate that any delay had been deleterious to plaintiff's knee or that there was any emergency condition requiring immediate surgery.  In fact, although plaintiff disputed the success of the surgery at his deposition, in January of 2008, Dr. Rubinovich reported that plaintiff was doing "exceptionally well." (Levin Decl. Ex. G at 2).  Thus, plaintiff has not shown that any alleged delay in surgery caused him any adverse affects or that the ultimate result of the surgery would have been different if the surgery was completed sooner.[20]  Thus, this court finds that any delay was not "sufficiently serious" to establish the objective prong of the Eighth Amendment analysis.  *See, e.g., Espinal v. Coughlin,* 98 Civ. 2579(RPP), 2002 WL 10450, at *3-5 (S.D.N.Y. Jan. 3, 2002)(no deliberate indifference to a serious medical need resulted from three-year delay in surgery for ruptured ACL, in favor of more conservative treatment)(citing *Demata v. New York State Corr. Dept. of Health Servs.*, 198 F.3d 233 (table), 1999 WL 753142 (2d Cir. 1999); *Culp v. Koenigsmann*, 99-CV-9557, 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000)(no "serious injury" where plaintiff suffered from torn meniscus and knee surgery was delayed for approximately one year);  *Taylor v. Kurtz*, 00-CV-700F, 2004 WL 2414847 at * 4 (W.D.N.Y. Oct. 28, 2004).

---

[20] The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eight Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter*, 316 F.3d at 188-89, n.14, n.15.

22

This court also finds that plaintiff has not raised a genuine issue of material fact with respect to the subjective prong of the Eighth Amendment test.  Each of plaintiff's letters of complaint was addressed, even though plaintiff testified that he never received responses to his inquiries.  The supervisory defendants that have been named in this case, are entitled to rely upon the investigations completed by the facility officials and by their designated subordinates.  All the documents submitted indicate that plaintiff's concerns were addressed, and that ultimately, plaintiff had his surgery, even though it was completed after this litigation was filed.  The fact that conservative treatment was attempted prior to surgery does not amount to deliberate indifference. *Id.*

A review of plaintiff's papers indicates that with respect to his alleged ankle problem, defendants were more than responsive.  Plaintiff had ***two sets*** of x-rays to determine that his ankle was not broken as he thought, and as he claimed in one of his letters to defendants Wright and Fischer.[21]  Although plaintiff complains that he did not receive his treatment until after he filed this action, the dates on the letters written to defendants all are either shortly before or after the filing of plaintiff's complaint.  Thus, this shows that when the officials were informed about plaintiff's complaints, action was taken to try to solve the problem.  In any event, plaintiff's disagreement

---

[21] The court notes that plaintiff apparently complained of other medical impairments.  The documents associated with his grievance indicate that plaintiff claimed that he hurt his back on April 25, 2007, but admitted that he did not report the injury.  Plaintiff had a CT scan of his back. (Wright Decl., Dkt. No. 38-6 at 9) (A computed tomography (CT) scan uses x-rays to create cross-sectional pictures of structures in the body. http://nlm.nih.gov/medlineplus/ency/article/ 003330.htm).

with the care he was receiving does not amount to deliberate indifference.  Plaintiff

has not raised a genuine issue of material fact regarding his medical care.[22]

### B.    Failure to Protect

Plaintiff has named defendants Fischer and Pearlman in conjunction with his

claim that defendants failed to protect plaintiff from assault on two occasions.  An

inmate has a right under the Eighth and Fourteenth Amendments to be spared "the

'unnecessary and wanton infliction of pain.'"  *Hendricks v. Coughlin*, 942 F.2d 109,

112 (2d Cir. 1991)(citation omitted).  An inmate's allegation that a defendant was

deliberately indifferent in failing to protect him from the violence of other inmates

states a claim under section 1983.  *Id.* at 113.

In order to state an Eighth Amendment claim for failure to protect, the plaintiff

must show that he was incarcerated under conditions posing a substantial risk of

serious harm, ***and*** prison officials acted with deliberate indifference to that risk and

the inmate's safety.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The plaintiff must

show that prison officials ***actually knew of and disregarded*** an excessive risk of harm

to the inmate's health and safety.  *Id.* at 837.  The defendant must be aware of the facts

from which the inference can be drawn that a substantial risk of serious harm exists,

and the defendant must also draw that inference.  *Id.*

An isolated omission by corrections officers generally does not support a claim

for deliberate indifference absent circumstances involving evil intent, recklessness, or

---

[22] To the extent that one of plaintiff's against defendant Neafach can be interpreted as alleging that she denied him access to the proper medical care, the claim will be discussed below.

deliberate indifference. *Coronado v. Goord*, 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, *10-11 (citing *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985)).  Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

### 1.    Personal Involvement

Plaintiff alleges that defendant Fischer was somehow responsible for these alleged assaults because he failed to properly investigate plaintiff's letters of complaint.  As stated above, the failure to investigate letters of complaint does not establish the personal involvement of a supervisory officer.  In any event, by the time that defendant Fischer received letters from plaintiff mentioning the alleged assaults, it was after the fact, and there was no action that defendant Fischer could have taken at that time to remedy any alleged violation.  The letters sent by plaintiff to defendant Fischer focus mainly upon his medical care, and in no way alerted defendant Fischer to the serious danger to plaintiff's safety from other inmates that he now alleges.  Thus, any failure to protect claim may be dismissed as against defendant Fischer for lack of personal involvement.

Defendant Pearlman was the Superintendent of Mid-State Correctional Facility at the times relevant to this amended complaint. (Pearlman Decl. ¶ 4,  Dkt. No. 38-7). Plaintiff alleges that defendant Pearlman did not properly investigate plaintiff's complaints regarding his safety and failed to properly supervise the correctional staff,

who in turn, failed to provide proper safety, resulting in the assault on plaintiff by "unknown." (AC at 5-d).

Plaintiff attempts to assert that defendant Pearlman is responsible for a lack of supervision because "[s]ometime" in January of 2007, one of the corrections officers was "conducting a drug operation under the nose of the Supt." *Id.* Clearly, even assuming the truth of plaintiff's allegation, he does not allege that the drug operation had anything to do with an alleged assault on plaintiff or assaults on inmates in general. Plaintiff cannot rely upon such "anecdotal evidence" to support his claim that this defendant was personally involved in a deprivation of this plaintiff's constitutional rights. *See Murphy v. Goord*, 445 F. Supp. 2d 261, 265 (W.D.N.Y. 2006)(plaintiff cannot rely on unrelated incidents to show personal involvement). Thus, plaintiff cannot show that defendant Pearlman was personally involved in any alleged constitutional violations.

## 2. Merits of the Failure to Protect Claim

In this case, there is absolutely no indication that defendant Pearlman (much less Commissioner Fischer) was aware of any substantial risk to plaintiff. Plaintiff, himself, does not know who allegedly attacked him on those two occasions. Plaintiff states that he was first assaulted on February 23, 2007. (AC at 5-d). Plaintiff states that "reports were made and not taken seriously." *Id.* The medical records indicate, however, that plaintiff did ***not*** report the February 23, 2007 assault to medical personnel. Plaintiff visited sick call on March 5, 2007, complaining of high blood pressure, cough, and cold symptoms. (Pearlman Decl. ¶ 14 & Ex. A at 1- Ambulatory

26

Health Record (AHR) entry 3/5/07.  The medical professional observed NAD (no acute distress) and diagnosed "dry cough [and] stuffy nose." *Id.*  On March 7, 2007, plaintiff returned to sick call, complaining only about his blood pressure. (*Id.* AHR entry 3/7/07).

The first time that plaintiff reported an assault to medical personnel was on March 14, 2007, claiming that he had been hit from behind on March 13, 2007, but was afraid to report it when it happened. (*Id.* Ex. A at 2- AHR entry dated 3/14/07). There was no mention of a prior assault.[23]  He attended sick call on March 19 and on March 23, 2007, complaining of pain and injuries relating to the March 13, 2007 incident.  Based on all of the evidence, including plaintiff's own allegations about the alleged assaults, there is absolutely no indication that defendant Pearlman, the Superintendent of Mid-State, would have been aware of and disregarded any substantial risk of harm to plaintiff, sufficient to render Superintendent Pearlman liable for failure to protect.

Plaintiff's attempt to show that defendant Pearlman was somehow aware that the security level at the facility was unsatisfactory by alleging that an officer was arrested for "conducting a drug operation under the nose of the Supt." is completely

---

[23] The court must point out that the amended complaint is inconsistent with respect to these alleged assaults. *Compare* AC at 5-d *with* AC at 5-e.  In the section describing his claims against defendant Pearlman, plaintiff states that he was assaulted on February 23, 2007, however, in the section of the amended complaint describing the claims against defendant Neafach, plaintiff states that on February 23, 2007, "someone" told plaintiff that "someone" was going to attack him from behind and that "the attempt was tried but unsuccessful . . . ." (AC at 5-e). Plaintiff also claims that there was an unsuccessful attempt to assault plaintiff on February 27, 2007. *Id.*

speculative.  Even assuming that an officer of the facility was arrested for drug-related behavior, there is no connection between such an event and a danger to plaintiff or to any other inmate.  Thus, plaintiff's claim of failure to protect should be dismissed.

### D.    Sexual Harassment/Retaliation

Plaintiff makes various claims regarding defendant Neafach, all related to an alleged incident in which defendant Neafach touched plaintiff inappropriately and failed to comply with the employee manual. (AC at 5-e).  Plaintiff alleges that defendant Neafach came up to plaintiff from behind, massaged his shoulders, and tried to grab the front of his "groin area." *Id.*

The Eighth Amendment protects an inmate from the "unnecessary and wanton infliction of pain." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)(quoting *Whitely v. Albers*, 475 U.S. 312, 319 (1986)).  In addition to providing the standard for constitutionally adequate medical care, the Eighth Amendment analysis also governs physical and sexual abuse of inmates.  In order to violate the Eighth Amendment, the "punishment" must be "objectively, sufficiently serious," and the official must have had a "sufficiently culpable state of mind." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

While allegations of sexual abuse may in some circumstances violate the Eighth Amendment, isolated incidents of harassment, involving verbal harassment and touching are not severe enough to be "objectively, sufficiently serious." *Boddie*, 105 F.3d at 861.  The plaintiff in *Boddie* was also claiming an Eighth Amendment violation based upon allegations of sexual abuse.  *Id.*  The court held that the "isolated

28

episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions.  But they do not involve a harm of federal constitutional proportions ... ." *Id.*

In this case, plaintiff alleges one instance in which defendant Neafach allegedly massaged his shoulders and "tried" to grab plaintiff's groin area.  Pursuant to the analysis in *Boddie*, this one incident, even if true, cannot form the basis for an Eighth Amendment violation.  The alleged conduct in this case does not even rise to the severity of the conduct alleged in *Boddie*.  Thus, any Eighth Amendment claim for sexual abuse against defendant Neafach may be dismissed.

Plaintiff claims that after he rejected defendant Neafach's advances, she proceeded to retaliate against him. (AC at 5-e, 5-f)  Plaintiff's statements in this regard are quite vague and confusing.  Plaintiff states that he heard that defendant Neafach was going to remove plaintiff from the CD/SOP program for poor performance, but that he actually wanted to be removed from the program because plaintiff felt that his life was in danger. (*Id.* at 5-f)  Plaintiff seems to claim that the alleged March assault was the result of this "danger" and because defendant Neafach ignored plaintiff's complaints. *Id.*  Plaintiff then concludes that defendant Neafach paid someone with drugs or sexual favors to assault plaintiff so that he would not tell anyone that she tried to seduce him. (*Id.* at 5-f, 5-g)

Finally, plaintiff states that defendant Neafach did not take the proper action when plaintiff was having an episode of "serious high blood pressure." (*Id.* at 5-g)  Plaintiff complains that instead of sending plaintiff to the infirmary, defendant

Neafach sent plaintiff to the mental health unit, thus, interfering with his ability to obtain medical care.

Defendant Neafach has submitted an affidavit, stating that plaintiff attempted to "monopolize" defendant Neafach's attention during class, and when defendant Neafach refused to give him the attention he desired, he began to make false statements about her. (Neafach Decl. ¶ 9).  On March 15, 2007, corrections counselor, James O'Brien informed plaintiff that he was being unsatisfactorily discharged from the program because of poor performance. (*Id.* ¶ 10).  At that time, plaintiff began to complain that he was in pain from an "attempted stabbing," and told Counselor O'Brien that plaintiff had written a note to defendant Neafach about the attempted stabbing, but that defendant Neafach threw the note away. (*Id.* ¶¶ 11-13).  Plaintiff also told Counselor O'Brien that defendant Neafach leaked confidential information about plaintiff to the general population and threatened plaintiff with discharge from the CD/SOTP program if he complained to Senior Corrections Counselor A. Joslyn. (*Id.* ¶¶ 14-15).

As a result, Senior Corrections Counselor Joslyn asked defendant Neafach to respond to plaintiff's accusations. (*Id.* ¶ 16).  After conducting an investigation, Senior Counselor Joslyn determined that plaintiff was inventing lies about defendant Neafach and wrote a misbehavior report against plaintiff charging plaintiff with lying and harassment. (*Id.* ¶ 19 & Ex. C).  Plaintiff was found guilty of the charges after a Tier II disciplinary hearing. *Id.*

Defendant Neafach denies ever harassing plaintiff, sexually or otherwise. (*Id.*

¶¶ 27-30).  Defendant further alleges that, contrary to plaintiff's allegations, she was never removed from Oneida Correctional Facility for any sexual misconduct and never paid any inmate with drugs or sexual favors to assault plaintiff. (*Id.* ¶¶ 31, 32). Finally, defendant Neafach states that because she has no medical training, when an inmate complains that he is suffering from "some malady," she simply refers the inmate to the facility's medical personnel. (*Id.* ¶¶ 36-38).

Defendant Neafach includes a note plaintiff sent to her, dated March 14, 2007, the day after plaintiff was allegedly assaulted. (Neafach Decl. Ex. A).  The note asks whether defendant Neafach would sit down with plaintiff so that she could "get to know" who he was. *Id.*  Plaintiff indicated that he did not trust anyone, but could start by trusting her. *Id.*  A second note from plaintiff states that he was apologizing "for [his] past behavior," and that he appreciated defendant Neafach's concern for his safety because an officer told plaintiff that defendant Neafach was worried about plaintiff. (*Id.* Ex. A at 2).  Defendant Neafach has also included documents from Counselor Joslyn's investigation and the resulting misbehavior report and disposition. (*Id.* Exs. B-D).

Unsupported, conclusory allegations are insufficient to sustain a claim under section 1983.  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)(conclusory allegations do not state a conspiracy claim under section 1983); *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)(conclusory allegations insufficient to state a claim for violation of constitutional rights).  This is particularly true when the cause of action involves allegations of retaliation, which are "easily fabricated."

*Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)

Plaintiff in this case has not responded to defendants' properly supported motion for summary judgment.  Conclusory allegations or denials are insufficient to defeat a motion for summary judgment when the moving party has set forth a documentary case.  *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).[24]  Plaintiff's allegations that defendant Neafach paid someone to assault him are completely outrageous and unsupported by any of the evidence.  Additionally, to the extent that plaintiff's amended complaint can be read to allege that any of the defendants "conspired" to deprive plaintiff of his constitutional rights, these allegations are also unsupported, conclusory, and may be dismissed. *Ciambriello, supra*.

Plaintiff's allegation that defendant Neafach sent him to the *mental* health department when he was having a *medical* problem does not establish a claim for deliberate indifference to his serious medical needs.  He cites no adverse consequences from defendant Neafach's mistake, nor does he rebut her claims that she simply referred him to the facility's medical personnel.  Finally, any unspecified claims that defendant Neafach violated either the employee manual or some New York State regulation do not rise to the level of constitutional claims. *See Dixon v. Goord*, 224 F.

---

[24] In this case, although plaintiff received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules, the plaintiff did not file a statement of undisputed material facts in compliance with Local Rule 7.1(a)(3).  Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement as true for purposes of this motion.  *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-296 (N.D.N.Y. 2007).

Supp. 2d 739, 744-45 (S.D.N.Y.  2002)(Violations of state law or regulations in themselves do not state a viable section 1983 claim). *See also Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990).

     **E.**    <u>**Americans with Disabilities Act**</u>

     In his amended complaint, plaintiff makes a passing reference to the ADA, stating that no accommodation was ever offered to him and that he was unable to function properly in programs or his daily activities. (AC at 5-a).  There is no explanation of what disability he alleges or what accommodation he allegedly required or how he was unable to participate in programs.

     The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005)(both the ADA and the Rehabilitation Act are applicable to inmates).  Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity.  *Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005).

     In order to establish a claim under the ADA, the plaintiff must first show that he has a ***disability***. *Farid v. Bouey*, 554 F. Supp. 2d 301, 326 (N.D.N.Y. 2008).  Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002); *Doe v. Goord*, No. 04-CV-570, 2004 U.S. Dist. LEXIS 24808, *62 (S.D.N.Y. Dec. 10,

2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)).  Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel*, 287 F.3d at 147.

Major life activities include, among others, caring for oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A).  Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B).  Plaintiff in this case has not specifically identified a disability, nor has he identified a "major life activity" that he claims has been "substantially limited." A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).[25]

Plaintiff in this case had a torn ACL, high blood pressure, an unspecified back problem, and an injured ankle.  He failed to identify either any major life activity that was substantially limited by these impairments or any activity or program in which he could not participate, and never stated what accommodation would have allowed him to do so.  Thus, plaintiff's passing reference to the ADA does not state any claim for relief under that statute.

---

[25] The court notes that amendments to the ADA, that took effect January 1, 2009 broadened the scope of the definition of disability, partially superceding *Toyota Mfg. See Guary v. Upstate Nat'l Bank*, 618 F. Supp. 2d 272, 275 n.1 (W.D.N.Y. 2009)(citing ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008)).  However, it has been held that these amendments do not apply retroactively, thus, they do not affect this Court's recommendation.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED, and the complaint DISMISSED IN ITS ENTIRETY.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 1, 2010

Hon. Andrew T. Baxter
U.S. Magistrate Judge

35